UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

BIOCAD JSC,

                        Plaintiff,

    -v-

F. HOFFMANN-LA ROCHE LTD., et al,

                        Defendants.

No. 16-cv-4226 (RJS)

MEMORANDUM & ORDER

---

RICHARD J. SULLIVAN, Circuit Judge:

In 2016, Plaintiff Biocad JSC ("Biocad") commenced this action against Defendants F. Hoffmann-La Roche Ltd. ("Roche") and Roche Holding AG ("Roche Holding") – two Swiss corporations – along with Genentech, Inc. ("Genentech"), an affiliated U.S. corporation, and R-Pharm JSC ("R-Pharm"), a Russian pharmaceutical company (collectively "Defendants"), alleging various antitrust violations under federal and state law.  On September 30, 2017, the Court issued an opinion dismissing Biocad's claims, *see Biocad, JSC v. F. Hoffman-La-Roche, Ltd.*, No. 16-cv-4226 (RJS), 2017 WL 4402564 (S.D.N.Y Sept. 30, 2017), and on November 5, 2019, the Second Circuit affirmed that decision, *see Biocad JSC v. F. Hoffmann-La Roche*, 942 F.3d 88 (2019).  Now before the Court is Defendants' motion to sanction Biocad and its counsel under 28 U.S.C. § 1927 and Rule 11 of the Federal Rules of Civil Procedure.  (Doc. Nos. 71, 72.)  For the reasons set forth below, Defendants' motion is GRANTED in part and DENIED in part.

## I. BACKGROUND AND PROCEDURAL HISTORY[1]

Biocad is a Russian pharmaceutical company that created biosimilars, or generic versions, of three "blockbuster" cancer-treatment drugs developed by Roche.  (FAC ¶¶ 4, 22, 34.)  Biocad competes with Roche in Russia and had plans to enter the United States market upon the expiration of Roche's exclusive rights to sell those drugs in 2018 and 2019.  (*Id.* ¶¶ 9, 22, 40, 56.)

On June 7, 2016, Biocad sued Roche, Genentech, and R-Pharm, alleging that it had been injured by those Defendants' anti-competitive conduct in violation of the Sherman Act, 15 U.S.C. §§ 1 and 2, the Clayton Act, 15 U.S.C. § 14, the Robinson-Patman Act, 15 U.S.C. § 13, the Donnelly Act, N.Y. General Business Law § 340 *et seq*., and common law tort.  (Compl. ¶¶ 166–216.)  The alleged anti-competitive conduct, which took place in Russia, included predatory pricing, tying arrangements, registration of a "non-existent" drug, and participation in auctions with fraudulent bids.  (*Id.* ¶¶ 6–15.)  Biocad also alleged that those Defendants limited the distribution network for the drugs in the United States "to slow down the entry of generic alternatives" into the U.S. market by competitors like Biocad.  (*Id.* ¶¶ 144–51.)

At a pre-motion conference on September 23, 2016, the Court and the three Defendants noted several deficiencies in Biocad's Complaint.  (*See* Hr'g Tr.)  These included: (1) the lack of personal jurisdiction over R-Pharm, a Russian corporation with its principal place of business in Russia and no business operations in the United States (*id.* at 8–12); (2) Biocad's lack of standing, since any injury to Biocad either occurred in Russia or was speculative, (*id.* at 12–22); and (3) the

---

[1] The facts are drawn from Biocad's Complaint (Doc. No. 1 ("Compl.")) and First Amended Complaint (Doc. No. 37 ("FAC")), the transcript of the September 23, 2016 pre-motion conference (Doc. No. 33 ("Hr'g Tr.")) and the Court's September 2017 order granting Defendants' motions to dismiss (Doc. No. 75), *see Biocad, JSC,* No. 16-cv-4226 (RJS), 2017 WL 4402564.  The Court has also considered Defendants' memoranda in support of their motions to dismiss the FAC (Doc. Nos. 52, 55, 57), Biocad's opposition to the motions to dismiss (Doc. No. 63), Defendants' memorandum of law in support of their motion for sanction (Doc. No. 72 ("Defs.' Mem.")), Biocad's opposition (Doc. No. 74 ("Opp'n")), Defendants' supplemental letter (Doc. No. 80 ("Defs.' Supp. Ltr.")), and Biocad's supplemental letter (Doc. No. 83 ("Biocad's Supp. Ltr.")), as well as all attached exhibits and declarations.

lack of subject matter jurisdiction given that the alleged conduct took place exclusively outside the United States and was beyond the reach of the Foreign Trade Antitrust Improvement Act ("FTAIA") (*id.* at 22–31).  During the conference, the Court observed that there was "not a viable cause of action, at least as currently pled," and that there was "arguably a Rule 11 motion to be made here."  (*Id*. at 38.)

On October 24, 2016, Biocad filed an Amended Complaint, adding Roche Holding as a defendant and attempting to address some of the deficiencies discussed during the pre-motion conference.   With respect to personal jurisdiction over R-Pharm, Biocad made conclusory allegations that R-Pharm has a subsidiary in the United States that was established merely "as part of [R-Pharm's] strategy to expand into the United States," that R-Pharm's illicit conduct was designed to have effect in the United States, and that R-Pharm was involved in a conspiracy with the other defendants to injure Biocad in the United States.  (FAC ¶¶ 20, 26–28.)  To bolster its standing, Biocad alleged new facts asserting its "intent and preparedness" to enter the U.S. market. (*Id.* ¶¶ 68–81.)  And as to subject matter jurisdiction, Biocad stated that its claims fell under the "import exclusion" exception of the FTAIA.  (*Id.* ¶¶ 64–67, 223–28, 230–33.)  The Amended Complaint altered Biocad's Clayton Act claims, abandoning its prior claim under section 3, 15 U.S.C § 14, but adding claims under sections 4 and 16 of the Act, 15 U.S.C. §§ 15 and 26, respectively.  (*Id.* ¶¶ 296–310.)  Biocad also alleged that Defendants gave kickbacks to doctors and sponsored R-Pharm's illegal activities in Russia.  (*Id.* ¶¶ 10, 151–69, 171–80.)

On December 12, 2016, R-Pharm, Genentech, and Roche filed motions to dismiss the Amended Complaint.  (Doc. Nos. 51, 53, 56.)  Among other things, they contended that Biocad failed to plead (1) an antitrust injury; (2) viable claims under the FTAIA, the Clayton Act, or the Robinson-Patman Act; or (3) personal jurisdiction over R-Pharm.  (Doc. Nos. 52, 55, 57.)

On March 7, 2017, Defendants jointly filed a motion to sanction Biocad under Rule 11 of the Federal Rules of Civil Procedure and 28 U.S.C. § 1927, asserting that Biocad unreasonably or vexatiously multiplied the proceedings by (1) bringing claims without an antitrust injury; (2) bringing claims contrary to the FTAIA, the Clayton Act, and the Robinson-Patman Act; (3) prosecuting with improper motives of extracting settlements and adjudicating Russian matters through the United States justice system; and (4) making specious arguments for personal jurisdiction over R-Pharm.  (Doc. Nos. 71, 72.)

On September 30, 2017, the Court granted Defendants' motions to dismiss, concluding that Biocad (1) lacked antitrust standing and (2) lacked a viable cause of action under the FTAIA, the Clayton Act, or the Robinson-Patman Act.  *Biocad, JSC*, 2017 WL 4402564, at *3, *6.  With respect to antitrust standing, the Court found that Biocad suffered no present injury in the United States and that any future injury was purely speculative, as Biocad had not established that it was prepared to enter the U.S. pharmaceutical market.  *Id.* at *3–6.  In doing so, the Court determined that to establish its preparedness to enter the U.S. pharmaceutical market, a prospective entrant must show that FDA approval is probable, which Biocad failed to do.  *Id*. at *4–5.  As to Biocad's FTAIA claim, the Court noted that Defendants' alleged conduct had a foreign locus and effect, thus meeting neither the "import" exception nor the "domestic effects" exception to the FTAIA. *Id.* at *7–10.  Similarly, the Court ruled that the foreign locus of the claims barred any causes of action under the Clayton and Robinson-Patman Acts.  *Id.* at *6–7.  The Court did not reach the personal jurisdiction issue.  *Id.* at *2 n.4.

Biocad appealed, and on November 5, 2019, the Second Circuit affirmed this Court's dismissal of the Amended Complaint.  *Biocad JSC*, 942 F.3d at 101.  The Second Circuit concluded that Biocad lacked a viable cause of action under the antitrust laws because Defendants' conduct

did not fall within the "import exclusion" (in other words, the import exception) of the FTAIA.[2]

*Id.* at 91, 92, 94–101. Nevertheless, the Circuit recognized that the statutory language of "conduct

involving . . . import trade or import commerce" in the FTAIA could invite different

interpretations. *Id.* at 96 (omission in original). Then-Chief Judge Katzmann wrote a separate

concurrence in which he agreed that Biocad's claims were barred by the FTAIA and that the panel

need not reach the antitrust standing issue, but noted that, had it reached the antitrust standing

issue, he would have disagreed "with the district court's determination that a potential entrant to a

pharmaceutical market must show at the motion to dismiss stage that FDA approval of its products

was probable." *Id.* at 101. In his view, the probability of FDA approval should be a significant

but not dispositive factor in establishing "preparedness" to enter the U.S. pharmaceutical market.

*Id.* at 105.

On December 18, 2019, Defendants renewed their motion for sanctions, stating that the

decisions by this Court and the Second Circuit confirmed that Biocad's claims were objectively

unreasonable and vexatious. (Defs.' Supp. Ltr. at 1, 2.) On January 15, 2020, Biocad responded,

arguing that the Second Circuit's acknowledgement that the language of the FTAIA can invite

different interpretations, coupled with Judge Katzmann's concurrence on antitrust standing,

"reinforce[d] that Biocad's claims and arguments had reasonable bases." (Biocad's Supp. Ltr. at

3.)

## II. LEGAL STANDARD

Rule 11(b) requires an attorney to certify "to the best of the person's knowledge,

information, and belief, formed after an inquiry reasonable under the circumstances," that his or

---

[2] Although this Court addressed the "domestic effects" exception to the FTAIA sua sponte, *Biocad, JSC*, 2017 WL 4402564, at *9, the Second Circuit declined to reach the "domestic effects" issue, finding that Biocad "waived its reliance on" that exception on appeal, *Biocad JSC*, 942 F.3d at 95.

her (1) motions and claims are not "presented for any improper purpose;" (2) legal contentions are "warranted by existing law or by a nonfrivolous argument" for extending or changing the law; (3) factual contentions have or are likely to have evidentiary support upon reasonable investigation or discovery; and (4) denials of fact are warranted on evidence, reasonably based belief, or a lack of information. Fed. R. Civ. P. 11(b). So long as the non-movant is given "notice and a reasonable opportunity to respond," Rule 11(c) permits the district court to impose appropriate sanctions for violations of Rule 11(b). Fed. R. Civ. P. 11(c)(1). In determining whether Rule 11(b) has been violated, courts apply an "objective standard of reasonableness." *United States v. Int'l Bhd. of Teamsters*, *Chauffeurs, Warehousemen & Helpers of Am., AFL-CIO*, 948 F.2d 1338, 1344 (2d Cir. 1991).

The Second Circuit has recognized that "the principal objective of the imposition of Rule 11 sanctions is not compensation of the victimized party but rather the deterrence of baseless filings and the curbing of abuses." *Caisse Nationale de Credit Agricole–CNCA, N.Y. Branch v. Valcorp, Inc.*, 28 F.3d 259, 266 (2d Cir. 1994). Thus, sanctions "must be limited to what suffices to deter repetition of the conduct or comparable conduct by others similarly situated." Fed. R. Civ. P. 11(c)(4). Furthermore, "imposition of Rule 11 sanctions is discretionary and should be reserved for extreme cases." *Gameologist Grp., LLC v. Sci. Games Int'l, Inc.*, No. 09-cv-6261 (JGK), 2012 WL 1446922, at *4 (S.D.N.Y. Apr. 26, 2012) (internal quotation marks omitted). As a result, "[s]anctions should only be imposed if it is patently clear that a claim has absolutely no chance of success, and all doubts should be resolved in favor of the signing attorney." *K.M.B. Warehouse Distribs., Inc. v. Walker Mfg. Co.*, 61 F.3d 123, 131 (2d Cir. 1995) (internal quotation marks omitted).

Similarly, 28 U.S.C. § 1927 states that any attorney or pro se litigant "who so multiplies the proceedings in any case unreasonably and vexatiously may be required by the court to satisfy personally the excess costs, expenses, and attorneys' fees reasonably incurred because of such conduct." "[A]n award under § 1927 is proper when the attorney's actions" show bad faith – that is, "are so completely without merit as to require the conclusion that they must have been undertaken for some improper purpose." *Int'l Bhd. of Teamsters*, 948 F.2d at 1345 (internal quotation marks and citations omitted). Alternatively, a § 1927 sanction is proper when an attorney "negligent[ly] or reckless[ly] fail[s] to perform his or her responsibility as an officer of the court" and those actions are not "undertaken as part of [the attorney's] role in representing [his or] her client." *United States v. Seltzer,* 227 F.3d 36, 41 (2d Cir. 2000).[3]

### III.  DISCUSSION

Defendants contend that sanctions are warranted because Biocad (1) brought claims without a recognized antitrust injury, thus lacking antitrust standing; (2) brought claims contrary to the FTAIA, Clayton Act, and Robinson-Patman Act; (3) prosecuted with the improper motive of extracting settlements or using the United States justice system to adjudicate Russian matters; and (4) made specious arguments for personal jurisdiction over R-Pharm.  (*See* Defs.' Mem. at 2, 3.)  The Court will address each argument in turn.

### A.  Bringing Claims Without Antitrust Injury

Defendants first assert that Biocad and its counsel should be sanctioned because they "willfully ignored their obligations under Rule 11" in bringing claims without an antitrust injury.

---

[3] *Seltzer* dealt with a district court's inherent power to impose sanctions, but the Court finds it applicable here because the Second Circuit has explained that "the only meaningful difference between an award made under § 1927 and one made pursuant to the court's inherent power is" that courts have inherent power to order awards against attorneys *and* parties, while § 1927 only permits awards against "persons authorized to practice before the courts." *Oliveri v. Thompson*, 803 F.2d 1265, 1273 (2d Cir. 1986).

(Defs.' Mem. at 8.)  To demonstrate antitrust standing, a plaintiff must allege "(a) that it suffered a special kind of 'antitrust injury,' and (b) that it is a suitable plaintiff to pursue the alleged antitrust violations."  *Gatt Commc'ns, Inc. v. PMC Assocs., L.L.C.*, 711 F.3d 68, 76 (2d Cir. 2013) (internal quotation marks omitted).  To establish antitrust injury, "the plaintiff must demonstrate that its injury is of the type the antitrust laws were intended to prevent."  *In re Aluminum Warehousing Antitrust Litig.*, 833 F.3d 151, 157 (2d Cir. 2016) (internal quotation marks omitted).  While a plaintiff that has yet to enter a market may be able to establish antitrust injury, the would-be competitor must first demonstrate its "intention and preparedness" to enter the relevant market. *See Reaemco, Inc. v. Allegheny Airlines*, 496 F. Supp. 546, 553 (S.D.N.Y. 1980) (quoting *Am. Banana Co. v. United Fruit Co.*, 166 F. 261, 264 (2d Cir. 1908)).

Here, Defendants assert that Biocad, which had no sales in the United States, failed to allege that it was prepared to enter the U.S. pharmaceutical market.  (Defs.' Mem. at 8–9.)  In particular, Defendants maintain that because Biocad could not enter the U.S. market until its drugs received FDA approval, and because Biocad failed to allege any specifics concerning its prospects for such FDA approval, Biocad provided insufficient facts to establish preparedness.  (*Id.* at 4, 9; *see also* Defs.' Supp. Ltr. at 2.)  Thus, Defendants argue that Biocad was objectively unreasonable in continuing to pursue this lawsuit, especially after the Court "[w]arned multiple times that [Biocad's] claims could not proceed absent injury" during the pre-motion conference.  (Defs.' Memo at 9.)

But while Biocad's initial Complaint was clearly defective in pleading an antitrust injury, Biocad's Amended Complaint and briefs did not patently fall below an objective standard of reasonableness on this point.  Although the Court agreed with Defendants that a plaintiff seeking entry into the U.S. pharmaceutical market must show "probable" FDA approval to satisfy the

preparedness prong, *Biocad JSC*, 2017 WL 4402564 at *3–4, other courts had taken different approaches to that question at the time of the Amended Complaint. *See, e.g.*, *BNLfood Invs. Ltd. SARL v. Martek Biosciences Corp.*, No. 11-cv-0446 (WDQ), 2011 WL 6439451, at *4 (D. Md. Dec. 14, 2011) (stating that "alleging mere anticipation of FDA approval may indicate preparedness to enter a market"); *Roxane Labs., Inc. v. SmithKline Beecham Corp.*, No. 09-cv-1638, 2010 WL 331704, at *3 (E.D. Pa. Jan. 26, 2010) (considering "the probability of FDA approval as [only] one significant factor to recognize within the intent and preparedness standard"). More importantly, the Second Circuit had not spoken to this issue – either at the time of the Amended Complaint or since – and in fact, Judge Katzmann's concurrence agreed with Biocad that the probability of FDA approval is a significant, but not dispositive, factor in determining preparedness to enter the U.S. pharmaceutical market. *Biocad JSC*, 942 F.3d at 105, 106. Accordingly, the Court cannot agree that Biocad's claim as to the antitrust injury had "absolutely no chance of success" at the time the Amended Complaint was filed. *K.M.B. Warehouse Distribs.*, 61 F.3d at 131.

### B.  Bringing Claims Contrary to Statute

Defendants next contend that Biocad should be sanctioned for unreasonably bringing claims contrary to the FTAIA, Clayton Act, and the Robinson-Patman Act. (Defs.' Mem. at 10–12.)

#### 1.  FTAIA of the Sherman Act

The FTAIA states that the Sherman Act "shall not apply to conduct involving trade or commerce . . . with foreign nations unless" the conduct falls under (1) the "import exclusion" exception or (2) the "domestic effects" exception. 15 U.S.C. § 6a; *see Lotes Co. v. Hon Hai Precision Indus. Co.*, 753 F.3d 395, 404, 411 (2d Cir. 2014). The "import exclusion" exception

applies to conduct involving "import trade or import commerce," 15 U.S.C. § 6a, including

"foreign anticompetitive conduct with an immediate impact on U.S. markets," *Maricultura Del

Norte v. World Bus. Capital, Inc.*, 159 F. Supp. 3d 368, 383 (S.D.N.Y. 2015) (citing *Lotes*, 753

F.3d at 411).   Defendants argue that the conduct alleged in the Amended Complaint neither

involved nor had any immediate effect on imports and "instead pertain[ed] entirely to

[Defendants'] sale of drugs in Russia."[4]   (Defs.' Mem. at 10 n.4.)   Defendants thus assert that

Biocad should be sanctioned for bringing claims under the Sherman Act without "provid[ing] any

justification for [its claims] or any basis on which existing law might be modified."   (*Id.* at 12.)

But while Biocad's claims were clearly based on a strained reading of this Circuit's

precedents, the Second Circuit nevertheless entertained Biocad's argument, noting that the word

"involving" in the FTAIA could be interpreted in a number of ways, including the interpretation

put forth by Biocad.   *Biocad JSC*, 942 F.3d at 95–97.   Considering that the Second Circuit

recognized the potential ambiguity of the statutory language in the FTAIA, the Court concludes

that Biocad's FTAIA claim, though ultimately meritless, was nonetheless "a nonfrivolous

argument for extending, modifying, or reversing existing law."   Fed. R. Civ. P. 11(b)(2).

## 2.   Clayton and Robinson-Patman Acts

Defendants also insist that Biocad's Clayton Act claims "have no statutory basis" as the

cited sections, §§ 15 and 26, "do not prohibit any conduct and cannot be the basis of a violation."

(Defs.' Mem. at 11.)   Contrary to Defendants' assertions, however, Biocad did not rely on §§ 15

and 26 of the Clayton Act as independent bases for violations; instead, Biocad maintained that

Defendants' actions "constitut[ed] violations of Sections 1 and 2 of the Sherman Act" (FAC

---

[4] Defendants also point out that Biocad's claim is barred by the FTAIA because the illegal conduct alleged does not
meet the "domestic effect[s]" exception.   (Defs.' Memo at 10.)   But while Biocad relied on the "domestic effect[s]"
exception in its original Complaint, Biocad withdrew that argument in favor of the import exclusion theory in its
Amended Complaint.

¶¶ 297, 305) – provisions which may prohibit foreign anticompetitive conduct in certain circumstances when the FTAIA does not apply.  *See Lotes Co.*, 753 F.3d at 398, 404.[5]

Defendants further argue that Biocad impermissibly asserted claims under the Robinson-Patman Act, 15 U.S.C. § 13(a), and the Clayton Act, 15 U.S.C. § 14, because "[t]he jurisdictional reach of both acts extends only to conduct involving products sold for 'use, consumption, or resale within the United States.'"  (Defs.' Mem. at 12 (citing 15 U.S.C. §§ 13(a), 14).)  Although Biocad withdrew its Clayton Act § 14 claim in its Amended Complaint, Biocad's continued assertion of the Robinson-Patman Act claim merits sanctions.  (FAC ¶¶ 121–27, 311–19.)  The Robinson-Patman Act makes it illegal "to discriminate in price between different purchasers of commodities of like grade and quality, where either or any of the purchases involved in such discrimination are in commerce, where such commodities are sold for use, consumption, or resale within the United States." 15 U.S.C. § 13(a).  Several courts, including this one, have previously explained that "the Robinson-Patman Act does not reach price discrimination in different national markets."  *C.E.D. Mobilephone Commc'ns, Inc. v. Harris Corp.*, No. 81-cv-4651 (JFK), 1985 WL 193, at *2 (S.D.N.Y. Jan. 14, 1985); *Zenith Radio Corp. v. Matsushita Elec. Indus. Co., Ltd.*, 402 F. Supp. 244, 248 (E.D. Pa. 1975) (dismissing suit for failure to state a claim where plaintiffs had alleged that foreign manufacturers violated the Robinson-Patman Act by charging U.S. purchasers higher prices than Japanese purchasers for certain products); *see also Laitram Mach., Inc. v. Carnitech A/S*, 884 F. Supp. 1074, 1079 (E.D. La. 1995) (dismissing counterclaims for Robinson-Patman violations involving sales and other conduct occurring in Iceland, India, and Norway).

---

[5] To be sure, Biocad did oddly – or perhaps carelessly – title its fifth claim for relief as "Violation of Section 4 of the Clayton Act 15 U.S.C. § 15." (FAC at 70.)  Nevertheless, just two paragraphs later, the Amended Complaint clarified that the violation related to "Sections 1 and 2 of the Sherman Act."  (*Id.* ¶ 297.)

Here, Biocad argued that the Robinson-Patman Act covers the alleged price discrimination between consumers in Russia and the United States.  (FAC ¶¶ 121–27, 311–19.)  But while this argument was not directly foreclosed by Second Circuit precedent, Biocad did not cite a single case that applied the relevant statutory provision to discriminatory pricing schemes across nations (Doc. No. 63 at 49–50.)  Moreover, even if there could be a "nonfrivolous argument for extending" the existing jurisprudence on the Robinson-Patman Act, Fed. R. Civ. P. 11(b)(2), Biocad failed to make such an argument here, devoting only three sentences in its opposition brief to the Robinson-Patman issue.  (Doc. No. 63 at 49–50.)  Generally speaking, lawyers and litigants are not permitted to evade contrary arguments simply by ignoring them, ostrich-style, in their briefs.  The Court therefore concludes that sanctions are warranted, and grants Defendants' motion under Rule 11 with respect to Biocad's claim under the Robinson-Patman Act.

## C.  Bringing Claims with Improper Motives

Defendants next contend that Biocad had improper motives for bringing the suit.  (Defs.' Mem. at 13, 14.)  Pointing to Biocad's own press releases contradicting its present claims of harm, and the fact that Biocad brought a previous suit in Russia with comparably disastrous results, Defendants argue that Biocad must have brought its U.S. claims with an improper motive designed to extract a settlement by adjudicating Russian matters using the United States justice system.  (*Id.*)

However, the materials put forth by Defendants do not definitively establish that Biocad brought its claims with improper motives.  First, while Biocad's press releases stated that Biocad was having "[g]reat success" in Russia and had a "[b]right future" worldwide, such vague statements are typically treated as puffery and do not support an inference that Biocad's claims of injury in the Amended Complaint were knowingly false.  (Doc. No. 73-1, Ex. A.)  Second, while it is true that the alleged kickbacks and bribes to Russian physicians began prior to Biocad's sale

of drugs in Russia, they nevertheless coincided with Biocad's development of biosimilars in 2010 (FAC ¶¶ 58, 136–40) and are thus not wholly inconsistent with Biocad's claim that Defendants "took every opportunity to destroy [Biocad] and prevent [Biocad's] U.S. market entry" (Opp'n at 11). Third, while Biocad did bring and lose a suit in Russia relating to "illegal tying" and the registration of what it calls an allegedly "non-existent" drug, the claims in this case involve a wider conspiracy with alleged injuries occurring in the United States. (*See* FAC ¶ 192–205; Doc. No. 73-6.) True, the Court advised the parties during the pre-motion conference that the claim would be better suited for adjudication in the Russian courts – advice that Biocad's counsel failed to heed. (Hr'g Tr. at 39.) Nonetheless, the Second Circuit seemed to view those claims as a closer call than this Court did. *Biocad JSC*, 942 F.3d at 95–97. Thus, while some aspects of the case suggest that Biocad's motives may have been suspect, the inference of improper motive is not so overwhelming as to compel sanctions.

### D. Specious Arguments for Personal Jurisdiction over R-Pharm

Finally, Defendants contend that Biocad should be sanctioned for making specious arguments for personal jurisdiction over R-Pharm. (Defs.' Mem. at 14–17.) The Due Process Clause requires that defendants be subject to personal jurisdiction of the court as a result of having "certain minimum contacts with [the forum] such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice." *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945) (internal quotation marks omitted); *see also World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 291 (1980). Those "traditional notions" require, among other things, that the litigation results from alleged injuries that "arise out of or relate to" the defendants' contacts with the forum. *Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 414 (1984) (internal quotation marks omitted). "In other words, there must be an affiliation between the forum

13

and the underlying controversy, principally, an activity or an occurrence that takes place in the

forum . . . and is therefore subject to [its] regulation." *Bristol-Meyers Squibb Co. v. Superior Court

of Cal., San Francisco*, 137 S. Ct. 1773, 1780 (2017) (brackets and internal quotation marks

omitted).  Furthermore, for "single or occasional acts occurring or having their impact within the

forum," courts inquire "whether there was some act by which the defendant purposefully availed

itself of the privilege of conducting activities within the forum . . . thus invoking the benefits and

protections of its laws." *Goodyear Dunlop Tires Operations, S.A., v. Brown*, 564 U.S. 915, 924

(2011) (internal quotation marks and alterations omitted).

Here, Defendants argue that, even following the Court's admonition regarding the lack of

personal jurisdiction over R-Pharm, "[Biocad's] Counsel continue[d] to ignore the separate

corporate identities of R-Pharm and its wholly owned U.S. subsidiary" and failed to establish that

Biocad's claims against R-Pharm "ar[o]se from, or relate[d] to, any alleged contacts by R-Pharm

in this forum." (Defs.' Mem. at 15, 16.)[6]  As Defendants note, some of Biocad's arguments *were*

untenable under existing law, and Biocad presented no valid argument for an assertion of personal

jurisdiction.  For example, all of R-Pharm's allegedly anticompetitive conduct occurred in Russia.

Thus, even if R-Pharm's U.S. subsidiary were "a mere department of R-Pharm" as Biocad claims

(Doc. No. 63 at 37–39; *see* Opp'n at 13), the activities of that U.S. subsidiary would still have no

relation to the alleged injury suffered by Biocad.  Further, even if it could have been argued that

---

[6] Defendants also insist that Biocad "suggest[ed] that R-Pharm could be subject to *general jurisdiction* in the U.S."
(Defs.' Mem. at 15 (emphasis in original).)  Contrary to Defendants' assertions, however, it does not seem that Biocad
ever made such a claim.  Biocad asserted that R-Pharm had "sufficient contacts with the U.S. under [Federal Rule of
Civil Procedure] 4(k)(2)" through operations in the United States and ownership of a U.S. subsidiary.  (*See* Doc. No.
63 at 25–27.)  Rule 4(k)(2) allows a district court to exercise personal jurisdiction over a defendant when "(1) the
claim arise[s] under federal law; (2) the defendant [is] not . . . subject to jurisdiction in any state's courts of general
jurisdiction; and (3) the exercise of jurisdiction [is] consistent with the United States Constitution and laws." *Porina v.
Marward Shipping Co.*, 521 F.3d 122, 127 (2d Cir. 2008).  The Second Circuit has not "conclusively answered"
whether *Schwab*'s standard for finding "minimum contacts" under a conspiracy-based jurisdiction theory can apply
cases involving Rule 4(k)(2). *See Rudersdal v. Harris*, No. 18-cv-11072 (GHW) (RWL), 2021 WL 2209042, at *15
(S.D.N.Y. Feb. 27, 2021).

R-Pharm's Russian activities had an "impact within" the United States, Biocad offered scant facts to suggest that R-Pharm purposefully availed itself of the privilege of conducting business in or the protection of the United States. *Goodyear*, 564 U.S. at 924. As this Court noted during the pre-motion conference, merely "pleading that somebody was engaged in or intended to violate U.S. laws is [not] enough to establish minimum contacts for purposes of finding personal jurisdiction." (Hr'g Tr at 11.)

However, at the time that Biocad's original Complaint and Amended Complaint were filed, a number of judges in the Southern District of New York had recognized the conspiracy-based theory of personal jurisdiction. *See, e.g., In re Satyam Comput. Servs. Ltd. Sec. Lit.*, 915 F. Supp. 2d 450, 484 (S.D.N.Y. 2013); *Singer v. Bell*, 585 F. Supp. 300, 302 (S.D.N.Y. 1984). And while R-Pharm asserts that "[n]umerous courts in the Second Circuit have expressed serious doubts about the viability of basing jurisdiction on [the] involvement of a co-conspirator," (Doc. No. 66 at 6), the Second Circuit has recently adopted a standard for conspiracy jurisdiction similar to the one used in *Satyam, see Charles Schwab Corp. v. Bank of Am. Corp.*, 883 F.3d 68, 87 (2d Cir. 2018) (stating that, to establish conspiracy jurisdiction, "the plaintiff must allege that (1) a conspiracy existed; (2) the defendant participated in the conspiracy; and (3) a co-conspirator's overt acts in furtherance of the conspiracy had sufficient contacts with a state to subject that co-conspirator to jurisdiction in that state").

Here, Biocad alleged facts suggesting that R-Pharm was engaged in a conspiracy with the other named Defendants, and that part of that conspiracy involved increasing the price of drugs sold in the United States to finance its lower, "predatory" pricing of the same drugs in Russia. (FAC ¶¶ 20, 26, 27, 121–27.) Although the Court ultimately determined that the facts alleged were insufficient to state a plausible claim, Biocad's conspiracy-based theory for personal

jurisdiction over R-Pharm was arguably "warranted by existing law" and therefore not wholly untenable.  Fed. R. Civ. P. 11(b).  While recognizing that Biocad made numerous specious arguments concerning personal jurisdiction, the Court will exercise its discretion to not impose sanctions on this issue.  Biocad's counsel has not previously been sanctioned under Rule 11 or § 1927.[7]  As "imposition of Rule 11 sanctions . . . should be reserved for extreme cases," *Gameologist Grp., LLC.*, 2012 WL 1446922, at \*4 (internal quotation marks and citation omitted), and "all doubts should be resolved in favor of the signing attorney," *K.M.B. Warehouse Distribs., Inc.*, 61 F.3d at 131 (internal quotation marks and citations omitted), the Court will forgo imposing sanctions on Biocad.

This is not to say that Biocad and its counsel have always been judicious in bringing claims. Biocad's initial Complaint was clearly deficient in establishing antitrust standing as well as personal jurisdiction over R-Pharm, and Biocad continued to assert an untenable argument for personal jurisdiction long after the Court cautioned that there is "arguably a Rule 11 motion to be made here."  (Hr'g. Tr. at 38.)  As courts consider prior conduct in exercising their discretion to impose sanctions, *see, e.g.*, *Lipin v. Hunt*, No. 14-cv-1081 (RJS), 2015 WL 1344406, at \*11 (S.D.N.Y. Mar. 20, 2015) (considering the plaintiff's "litany of [previous] frivolous lawsuits" in imposing Rule 11 sanctions), Biocad and its counsel should be aware that this Court (and others like it) are not likely to be so forgiving in the future.

---

[7] In *Finkelman v. SBRE, LLC*, the Supreme Court of New York did impose sanctions on Biocad's counsel, under 22 NYCRR 130-1.1, for bringing a frivolous claim.  No. 013159, 2008 WL 4537786 (N.Y. Sup. Ct. Sept. 18, 2008), *rev'd,* 71 A.D.3d 1081 (N.Y. App. Div. 2010).  However, the ruling was reversed by the Appellate Division, which found that counsel's claims were "not frivolous because [counsel] raised a genuine legal dispute" and the Supreme Court of New York had abused its discretion in imposing sanctions.  *Finkelman v. SBRE, LLC*, 71 A.D.3d 1081, 1082 (N.Y. App. Div. 2010).

## IV. CONCLUSION

For the foregoing reasons, Defendants' motion for sanctions is GRANTED in part and DENIED in part.  IT IS HEREBY ORDERED that Biocad shall pay to Defendants the total amount of attorneys' fees and costs involved in responding to Biocad's unfounded allegations brought under the Robinson-Patman Act.  Because the Robinson-Patman discussion made up approximately 4% of the total pages that Defendants collectively spent responding to Biocad's Amended Complaint and in their moving for sanctions, *see* Doc. Nos. 52, 55, 57, 65, 66, 67, and 72, fees will be limited proportionally.  IT IS FURTHER ORDERED that Defendants shall file submissions setting forth the total cost of the motion for sanctions and their respective motions to dismiss (including reply briefs) no later than February 11, 2022.  Plaintiffs may respond to Defendants' submissions no later than February 25, 2022.  The Clerk of the Court is respectfully directed to terminate the motion pending at Doc. No. 71.

SO ORDERED.

Dated:          January 28, 2022
                New York, New York

_____
RICHARD J. SULLIVAN
UNITED STATES CIRCUIT JUDGE
Sitting by Designation